ST. LOUIS, IRON MOUNTAIN & SOUTHERN RAILWAY COMPANY
*v.* WISEMAN.

Opinion delivered June 21, 1915.

1.   MASTER AND SERVANT—INJURY TO SERVANT—ASSUMED RISK.—An employee of a railway company was engaged in repair work, which could best be done by the use of a jack, but which was frequently done with a prize-pole; the employee using the prize-pole, the same slipped, inflicting an injury upon him, of which he died; *Held,* the deceased assumed the risk attendant upon the work which he was performing.

2.   RAILROADS—INJURY TO EMPLOYEE—"RAILROAD HAZARDS."—An employee of a railroad company was injured while engaged in repairing a car, by the slipping of a prize-pole, with which he was attempting to move a car wheel, *held,* the work did not expose the employee to those peculiar hazards which are incident to and connected with the physical use and operation of a line of railroad, and the work in which he was engaged did not bring him within the protection of Act 88, p. 55, Public Acts of 1911.

Appeal from Desha Circuit Court; *Antonio B. Grace,* Judge; reversed.

STATEMENT BY THE COURT.

This is an appeal from a judgment for $10,000 recovered by appellee against the appellant for the alleged negligent killing of her husband, Robert M. Wiseman. The facts are substantially as follows:

Wiseman was employed by appellant as a car repairer at McGehee, Arkansas. He had been engaged in such work for several months. On the 14th of April, 1913, he and one Duckworth, a fellow-servant, were engaged in the work of "brassing a car," that is, taking out the old and putting new brass in the journal box. Duckworth describes the manner in which they were doing this work as follows: "We would take what we call a journal jack, a small jack, and set it under the journal box and jack the box up so as to get the brass out—lighten up on it and take the brass out and put the new one in. Frequently, in jacking that up, the wheel would come with it. When the wheel comes up, we have to prize it down or take a jack and jack it down. The wheel has to come down before you can get the brass in. We had taken out the brass— had the box jacked up and had to pull the wheel down. The proper and customary way of getting the wheel down was to use the jack if we had it; if not, we used a prize pole. The jack is the safest way. I do not think there is any danger at all in doing the work with a jack. On this occasion, we were using a prize pole to prize the wheel down. When we jacked the car up, the wheel rose with it."

The witness then testifies that he and Wiseman looked up and down the track for a jack to prize the wheel down, and did not find one. So Duckworth took a prize pole and prized the wheel down. Wiseman took the brass and wedge out and carried the old brass to the supply room to get a new one. When Wiseman came back he picked up the prize pole, turned it edgewise in order to make it strong enough to pull the wheel down, and as he pulled up on it, it whirled and turned away, and the pole slipped and struck him in the side. The foreman had complained on different occasions about being short on jacks. If a jack had been used, there could have been no slipping.

The work was done both ways. If they had jacks, they jacked the wheel down, and if they didn't, they would get a prize pole. The scantling, used as a prize pole, was two inches thick and four inches wide, and something like eight or ten feet long.

The witness J. W. Goodwin testified that he was the foreman of the car repair department at McGehee. He describes the way the work was done as follows: "The first thing they do in order to allow the box to come up in order to take the brass out, place a jack under the journal box and jack it up high enough for the brass to come out; that throws the wheel down in order to bring the brass up; that is the proper method of taking the brass out. There has been a practice of putting a jack under the box, raising it up and putting a pole under them to bear the wheel down. This is a method that has been used and practiced a good deal."

The witness was asked what was the usual way of doing it, and answered, "Well, there is about as much use one way as the other. I suppose, about half and half." Witness had always told the men to put the jacks under there for the reason that it was much easier for them to do it. Wiseman nor any one else ever made any complaint about the insufficiency of jacks. If they did, witness would tell them to wait until the other men who were using the jacks got through with them. That was the case when the jacks were all in use at one time.

Appellee, as administratrix of the estate of her husband, Robert M. Wiseman, brought this suit against the appellant to recover damages for herself as widow and for the minor children. She alleged that the appellant was negligent in failing to furnish a sufficient number of jack-screws to enable Wiseman to do the work assigned to him as a car repairer, and that he was directed instead to elevate the car by means of a scantling or prize pole, and that in the use of the same by him, the same slipped, turned over and struck him in the breast, resulting in injuries from which he died. The answer denied the allegations of negligence and damages, and set up the defense

of contributory negligence and assumed risk. The appellant asked the court to instruct the jury to return a verdict in its favor, which the court refused.

The appellant, among other instructions, asked the court to tell the jury, in substance, that if Wiseman was injured as a result of the manner or method which had been adopted by appellant or its servants in doing the work in which he was engaged, and that he knew of such method or manner of doing the work, and continued in the employment of the appellant without complaint, he assumed the risk, and their verdict should be for the appellant.

The court refused the above prayers and appellant duly saved its exceptions. The court submitted the cause to the jury on the issues of the alleged negligence of appellant and comparative contributory negligence of Wiseman. The appellant objected to the court's instructions, because they ignored the issue of assumed risk.

*E. B. Kinsworthy, Jas. C. Knox,* and *T. D. Crawford,* for appellant.

1. The court's instructions ignored the issues of contributory negligence and assumed risk by deceased. 113 Ark. 60; 87 Ark. 576; 1 White on Personal Injuries, § 25.

2. The injury was accidental and there was no negligence on defendant's part. Wiseman's negligence was the proximate cause of the injury, and a verdict should have been directed for defendant. Cases *supra.*

3. The verdict is excessive. 117 Ark. 198.

*J. C. Brown* and *Ben D. Brickhouse,* for appellee.

1. The slipping of the pole, we admit, was accidental, but defendant failed to provide proper appliances, or use ordinary care in providing same. The action is based on the common-law liability of carriers and Act No. 88, Acts 1911. Labatt on Master & Servant, volume 3 (2 ed.), pp. 2498, 2502, 2563.

2. Contributory negligence of a fellow-servant does not preclude a recovery for an injury to an employee of which the proximate cause was the failure of the employer

to furnish suitable appliance.  56 Kans. 109; 42 Pac. 343; 4 Labatt, M. & S., p. 4790; 15 C. C. A. 52; 67 Fed. 881. The master must be free from negligence.  81 Va. 7; 12 Minn. 357; 77 S. E. 863; 125 Pac. 67; 87 Kans. 571.  The question of negligence was one for the jury.  139 N. W. 142; 76 N. E. 261; 137 Pac. 755; 153 Ill. App. 511.

3.  Defendant's negligence was the proximate cause of the injury.  4 Labatt, M. & S., p. 4784; 106 U. S. 700; 69 Fed. 823; 80 N. W. 561; 136 N. W. 323.

4.  The doctrine of "assumed risk" does not apply here.  116 Ark. 461; 60 Ark. 558; 76 *Id.* 234.

WOOD, J., (after stating the facts).  The uncontroverted evidence shows that the work of letting down the wheel, in which Wiseman was engaged at the time of his injury, was done by the use of a jack if the employees had a jack for that purpose, and, if not, it was done by using a prize pole.  Wiseman had been engaged in this work for several months.  Instead of waiting until he could procure a jack, which was the safest way of doing it, and without making any complaint to his foreman that he had no jack for the purpose, he undertook to do the work in the customary way when there were no jacks at hand, by the use of a prize pole, and while so doing, the pole slipped and he received the injury from which he died.

(1)  The foreman testified that he had always told the men to put the jacks under there for the reason that it was easier for them to do it, but that it was done about as much one way as the other.  Wiseman, being familiar with this method of doing the work, and knowing and appreciating the danger incident thereto, in deliberately choosing this manner of doing it, must be held to have assumed the risk.  It was one of the ordinary dangers of the service when performed in this way.  See, 3 Labatt's Master & Servant, section 1166.

If the use of the scantling was dangerous, which it proved to be, Wiseman knew and appreciated it, and it therefore was a risk which he assumed.  See Crawford's Digest, vol. 5, p. 1079, f., "Risks assumed by a servant."

(2)    To avoid the effect of this doctrine of assumed risk, appellee invokes Act No. 88, approved March 8, 1911, of the Acts of 1911. That act was construed by us in the recent case of *St. Louis, I. M. & S. Ry. Co,* v. *Ingram,* 118 Ark. 377. Ingram, with others, was engaged in removing some old guard rails from two bridges on the line of railroad, and they were using these guard rails as skids, or running boards over which piling was being rolled from a push car into a flat car. This flat car was standing on the sidetrack of the railroad. In that case, Judge Hart, speaking for the court, said: "After a careful consideration of the whole statute, we do not think the Legislature intended to restrict its terms to those actually engaged in running trains. * * * We think the statute is broad enough to include something more than the mere running of locomotives and trains of the railroad company. It includes every employee who, when injured, was performing some work in the line of his duty directly connected with and incident to the use and operation of a railroad. The loading and unloading of cars is intimately associated with and directly connected with the operation of a railroad. Plaintiff, at the time he was injured, was doing a part of the work necessarily connected with the operation of defendant's trains. He was helping to load a car with piling to be transported to another part of defendant's line of road, and this work was inseparably connected with the operation of the defendant's line of road, and brings this case within the spirit of the statute."

The purpose of the Act of 1911 was not to include all the employees engaged in every department of the service. *K. C. & M. Ry. Co.* v. *Huff,* 116 Ark. 461, 173 S. W. 419; *Ry.* v. *Ingram, supra.* But its design was for the protection of those whose work exposed them to those "characteristic dangers peculiarly connected with the operation of railroads known as 'railroad hazards.'" *Peter Johnson* v. *Great Northern Ry. Co.,* 104 Minn. 444, 116 N. W. 936.

"Railroad Hazards," in the sense of this statute, are those peculiar dangers to which employees are exposed while they are engaged in work connected with, and neces-

sary to the operation or running of trains over a line of railroad. In *Railway Company* v. *Ingram, supra,* we said: "It includes every employee who, when injured, was performing some work in the line of his duty directly connected with and incident to the use and operation of a railroad." The facts show the sense in which the words "use and operation of a railroad" were employed. The words "use and operation of a railroad" as used in the opinion relate to that department of the service in which employees, at the time of their injury, are actually engaged in the running of trains or in work that is incident thereto or intimately connected therewith.

It would be a difficult task to determine in advance and to define specifically what cases may fall within the purview of the statute. Each case will depend upon its own peculiar facts as developed. But the undisputed facts of the present record show that Wiseman, at the time of his injury, was engaged in the work of repairing a car in the shops at McGehee. This work in no manner exposed him to those peculiar hazards which are incident to, and connected with, the physical use and operation of a line of railroad, and the work in which he was engaged did not bring him within the protection of Act No. 88, of the Acts of 1911, as construed by us in *Railway Company* v. *Ingram, supra.*

In *Potter* v. *Chicago, Rock Island & Pacific Ry. Co.,* 46 Iowa, 399, it was held that the liability of a railway company to an employee injured in a machine shop is determinable by the common law, and not by the statute, since such employee, within the meaning of the statute, was not engaged in "the operation of a railroad." And in *Hathaway* v. *Illinois Cent. Ry. Co.,* 92 Iowa 337, it was held that an engine dispatcher who was assisting a machinist in placing a spring in one of defendant's locomotives was not engaged in work "in any manner connected with the use and operation of a railroad" within the meaning of those terms as employed in the statute.

The construction we have placed upon the statute is the same·.as if the above terms were embodied in it and were used in the sense above indicated. The court erred in its ruling upon the instructions.

The judgment is therefore reversed and the cause dismissed.